We have six cases on our docket this morning, but only four oral arguments. One was canceled at the last minute. I assume the attorneys for that case are not here, although I heard that one was already on the plane. No one has any information on that? It's okay. Okay. We'll start with our first case, 22-5076 U.S. v. Walker. Mr. Hilzendegger. Good morning, your honors. May it please the court. My name is Keith Hilzendegger. I'm from the Federal Public Defender's Office in Phoenix, Arizona, and I represent the defendant, Kenneth Walker. I'm prepared to discuss all of the issues in this case, of course, but I would like to focus this morning on three main reasons why this court should reverse Mr. Walker's conviction and remand for a new trial. The first is that the government did not properly authenticate the documents attesting to Ms. Dirickson's membership in the Cherokee Nation. The second is that the trial judge should have precluded the government's expert from testifying as a sanction for its late disclosure of the expert. And third, the expert's testimony in any event was inadmissible because under this court's case law, he merely vouched for Ms. Dirickson as a witness, and thus his testimony was not helpful to the jury as required by Rule 702. Turning to the authentication issue, what happened at the trial was the government produced these documents, we objected, and the trial judge overruled the objection without any explanation. So here on appeal, the government as the proponent of this evidence has to show either that these documents were self-authenticating, or if they weren't, that they were properly authenticated by following Rule 901. Well, what about the CDIB card? It had a signature, it had a seal. What more do you need to self-authenticate? Well, I have two answers to that, Your Honor. The first is what more that you need is some evidence that the person who signed it is the appropriate issuing officer. And the trouble there is, if you look at the CDIB card and you look at the enrollment card, they appear to be signed by the very same person. The enrollment card's different than the CIDB card. The signature on both appears to me to be the same. Well, are you a handwriting expert? I have eyes to look at. I'm just saying they appear to me to be the same. But the point is, Your Honor. Well, they're the same name. They are the same name. And the point is, Your Honor, the government had the burden of clearing up this ambiguity. Is this person... Go ahead. Is this person... What person are you speaking about? The person who signed both the CDIB card and the enrollment card. Is this person an officer of, at least for self-authenticating the CDIB card, is this person an official of the Department of the Interior? We don't know, because the government didn't produce any evidence one way or the other. Did you ask them to produce the evidence? I don't think it's our burden, Your Honor, to ask. Well, did you ask them at any point? We objected to admitting these documents, and I think that's sufficient to hold the government to its burden of production. Well, why, if they're otherwise self-authenticating, why, I mean, that isn't the very definition of self-authenticating, that you don't have to do anything more. Well, they're self-authenticating, Your Honor, if they meet certain requirements. And by the way, they're both not self-authenticating. The enrollment card, a document of the tribal official, is not, under the rule, self-authenticating. And in order for the CDIB card to be self-authenticating, there has to be both a seal. I'm not 100 percent sure, although I don't want to belabor the point, that the logo of the Department of the Interior is a seal, but even if it is, there's still the problem with the signature. My second answer to Judge Kelly's question was going to be, the government, in its brief, said that Ms. Dirickson's testimony authenticated these documents, and that's problematic for a couple of reasons. But as to the self-authenticating question, that statement in the government's brief, that Ms. Dirickson's testimony authenticated the document, is sort of an implicit concession that neither document was self-authenticating. Well, let me ask you this. How do you authenticate a self-authenticating document? I mean, the rule says, if it's signed and sealed, it's self-authenticating. That's correct. You can't go and prove that the person who signed it and put the seal on it is also the person entitled to do that. It's not self-authenticating. Well, it's self-authenticating to the extent that... It's not self-authenticating at all if you go through the whole rigmarole twice. I guess... What more needed to be done, in your view? What more needed to be done was either the government present maybe a declaration or some testimony from this issuing officer or someone from the Bureau of Indian Affairs who could explain how the document was created. Anytime there's a self-authenticating document, you still need to have testimony authenticating it. That's what makes the document self-authenticating, is that there's an execution or an attestation from an officer of a federal agency. Let me ask you about the Ms. Dirksen's testimony. She testified to what they are. Yes. They were documents given to her. Is that correct? They were given to her when she was a child, and she has no first-hand knowledge of how they were created. You don't think what she said would lead a reasonable person to believe that those were actually her membership documents? Well... When you say a child, how old was she? She was two years old when the CDIB card was generated, and she was four when the enrollment card was generated. So would you require the person who actually signed it to come in when she was from 15, 16 years ago? Just some official of the issuing agency, not necessarily the person who signed it. All right. Thank you. Yeah. Well, authentication is not supposed to be overly formalistic. It's whether a reasonable person could think this document was a real document, was what it purports to be. Yes. And it looks like a real document. She says it's the document that was given to her as a child. She had it for a long time. But the way you authenticate a document is by presenting testimony from a person who knows how it was created. You said that several times. Let's go to your next issue. Okay. The government, the district court should have excluded the testimony of the government's medical expert for two reasons. Counsel, could I just ask one last question? It's not so much about the authentication, but you also raised some questions in your brief, not only about the CDIB card, but also the evidence presented as to whether your client was Indian or non-Indian, correct? I did, Your Honor. I don't have anything to add beyond what I put in my opening brief. You're not conceding anything, though. I'm not conceding it, but I don't have any additional. So here's my question. If the victim here, at the end of the day, we disagree with you on your first argument, and therefore, if the victim is an Indian, crime occurs in Indian country, didn't the federal court have jurisdiction whether or not Mr. Walker, the defendant, is an Indian? Because if he's non-Indian, 1152. If he's Indian, 1153. That would expose a defect in the indictment, Your Honor, because the government only charged this case, invoked the jurisdiction of the district court under section 1152. Isn't there authority that under that set of circumstances, we'd have harmless error? Your Honor, I imagine that that is probably true, because at the end of the day, it wouldn't matter. The district court would have had jurisdiction under one statute or the other. All right. Thank you. So the district court should have prevented the government's medical expert from testifying for either one of two reasons. In the limited time that I have left, I think the more important reason is the fact that the district court, or I'm sorry, that the expert testimony was not helpful to the trier of fact under this court's decision in Charlie, which establishes the rule that an opinion of an expert that's based basically on crediting a victim's account of a crime is essentially vouching for that victim's credibility and therefore, doesn't assist the trier of fact as Rule 702 requires. Well, Charlie was followed, what was the name of the case, shortly after the same panel with the same expert in Velarde addressed the same issue. Are you familiar with Velarde? I'm not a hundred percent familiar with Velarde. The situation with Charlie is you had, we were just getting started on the trial, we were having trouble with people testifying. They could tell whether a child was sexually abused just by some symptoms and so on, with no scientific evidence to support it. As I understand Velarde, that was the basis of the problem in Charlie, is the physician's testimony had no scientific reliability established. So therefore, the only basis on which the expert could say that the child was sexually abused was by believing in the veracity of the child, in the truthfulness of the child. Here it's very different. This expert talks a lot about the medicine here, and what happens when you're strangled. And the scientific basis wasn't challenged, and I'm not sure it could be. I suspect it couldn't be challenged. So you had a lot more here to establish the reliability of the analysis performed by the expert. If every time your expert testimony is based on some statement by the victim, then there's no place for expert testimony. We always have the experts say, assuming this, what happened? And it was very clear from the cross-examination here that that was the case and the jury knew that. So what's the problem? The problem, Your Honor, is that the expert's opinions were not limited solely to these are the potential medical consequences of a strangulation-type injury. His opinions went further. They said the victim suffered these outrageously horrible and serious consequences of a strangulation. Well, he testified that the bruising was consistent with strangulation or concussion. Well, the victim... He didn't say that the victim was... that he was approving the victim's testimony. He said it's consistent. She said she was strangled. The expert said... And she had bruising on her neck. And the expert said that was consistent with strangulation. Is there something wrong with that? That jury who hears that is going to... Well, is it true or false? That is the expert's testimony. We didn't contest it. And you didn't object at that point on vouching either. Well, we objected before trial. You objected generally. And the judge said, I will not let him vouch for anybody. And that was the last word. And it was never objected to when the testimony that you claim is vouching was adduced. Isn't that correct? We did not object to specific pieces of the expert's testimony on those grounds, yes, Your Honor. But... Once the court promised that he would not permit vouching, didn't you have an obligation, if you thought it was vouching, to stand up and say, objection, now he's vouching? Perhaps we did, Your Honor, but... And so you waived it then. Well, there's no preservation issue as to this... There's no preservation question as to this issue because the government didn't raise it in its brief. So the government's waived any waiver. That leaves it up to us, doesn't it? If there's a waiver of a waiver, that essentially means it's in the discretion of the appellate court to decide whether to hold you to what you waived. I suppose that's true, Your Honor. I think that's been our practice. Sometimes we say the waiver was waived and sometimes we don't. But I'm more concerned about something fairly basic. Experts always testify that if you assume these facts, then what happened? And there's no question the expert could rely on the victim's statement that I saw stars, I was dizzy. Are you saying that the expert couldn't rely on that? I'm saying that... Just... Of course, the answer is of course not. The difficulty is he interviewed the victim in a cursory manner well after the events transpired rather than, or perhaps in addition to, looking at the contemporaneous records generated by other treating. I thought he said he did review the medical report and the police report. No? I'll double check that, Your Honor, and file a 20HA letter seeing as my time has expired. I'd like to pursue this a moment with you. That's fine. Briefly. But are you saying that if an expert opinion, say of strangulation, was based in part on the victim's description of her symptoms, then that's vouching for the victim? When... Just... Those statements, yes, Your Honor, I am. You think that would be vouching? It is vouching in these circumstances. So there's no way an expert can testify at trial in a medical malpractice case about the performance of a doctor if the expert says the doctor misdiagnosed this because the patient had these symptoms and the doctor did nothing about it. I guess, Your Honor, in that situation, there's facts that the expert is relying on are hypothetical in the sense that they don't come to him directly from the patient. But, well, you don't have to these days express it as a hypothetical. The expert doesn't even need to say specifically what was relied on. That's left to examination, pursuit on cross-examination, which was exactly what was done here. And don't you agree that the defense attorney made it very clear that the expert was assuming the truth of what the victim, how the victim described what happened? Once our, once the judge made the decision to allow the expert to testify, that was all we could do is cross-examine the. Well, but didn't that cross-examination take care of the very problem you're concerned about? Do you think the jury had any doubt that the expert was relying on the statements of symptoms by the victim when he expressed his opinion? I think the jury could equally have said that the problem here is that the, I'm just gonna say what I was at over again, so let me say this a little bit differently. It was up to the jury to decide whether there was serious bodily injury based on Ms. Derrickson's testimony and the pictures of her injuries that they saw. What the expert here did is embellish that testimony by saying, well, you know, you could, if you're strangled in this particular way, you could die in seven seconds. And. Well, that's clearly within his, I think we get your point. Okay. Thank you, counsel. Thank you. Ms. Dick. Good morning. May it please the court, Elizabeth Dick for the United States. Dr. Smock did not vouch for the victim's credibility when he summarized the medical evidence and opined that her symptoms were consistent with strangulation and concussion. This testimony was admissible under Charlie and under the subsequent case to Charlie, which is Carew, where this court held that an expert may summarize the medical evidence and express an opinion that the evidence is consistent or inconsistent with the victim's allegations of sexual abuse. Dr. Smock did not express an opinion about the victim's veracity or whether the crime had occurred and relying on symptoms is not vouching. Most treating physicians have to rely on symptoms patients share in reaching their diagnosis. But Dr. Smock relied on more than just the symptoms that the victim shared with him. He reviewed the police report, color photographs of her injuries, an EMS run report, and medical records where the victim told the nurse that she had been choked by her uncle and had been head butted in the forehead. And the medical records also reflected a diagnosis of a closed head injury and acute cervical myofascial strain. And the discharge instructions were for neck pain and concussion. And Dr. Smock further conducted a 15 to 20 minute phone interview with Ms. Derrickson and the symptoms that she shared with him were included headache, vision changes, unable to breathe, neck pain, head pain. And she said that her vision became blurry when she was strangled. It was hard for her to breathe and she has had confusion and memory issues since the assault. Based on his global review of the evidence, he opined that her injuries were consistent with a near fatal strangulation and based on certain symptoms, a concussion. And during cross-examination, the limitations of Dr. Smock's testimony were highlighted. He acknowledged that her symptoms were subjective, that he did not personally witness the incident and that he had to rely on the things that she told him as part of the evidence forming the basis of his opinion. This was helpful for the jury in understanding their role in determining the credibility of the victim. And Dr. Smock's assumption of the truth was explicitly highlighted for the jury because he agreed that if the things are being told to him were not true, that would affect his opinion and how his opinion should be viewed or judged. I'd like to talk really briefly about the Indian status evidence and particularly first, Mr. Walker's Indian status. There is nothing in the record to suggest that Sergeant Lindsey did not have personal knowledge of Mr. Walker's Indian status. Well, is there anything in the record to suggest that he did? He did testify that as of the night of the report, he was not a member of any federally recognized tribe, but before he testified to that, he testified he had prior contacts with Mr. Walker, he'd been an officer for nearly 23 years, he was cross-deputized with the Cherokee Marshal Service and since McGirt, that had changed the way that he conducted his investigations. I guess I'm just not seeing how that tells us anything about Mr. Walker's status. Maybe Sergeant Lindsey had contact with Mr. Walker, but it doesn't follow from that unless we have more to work with that he knows one way or the other what his status is. How does any of that indicate Mr. Walker's status? Well, all of that testimony, based on all that testimony, any rational juror could have inferred that Sergeant Lindsey based on his prior contacts or his investigation in this case. Well, could you maybe elaborate on that? That sounds more like an assertion than an explanation. Well, Mr. Walker did not set forth any evidence that he was Indian. It isn't his burden, it's your burden. It's the government's burden. That's correct. To show that the court has jurisdiction. Well, and before Sergeant Lindsey testified, the victim, Ms. Derrickson testified that she was not aware of any federally recognized tribe. And that doesn't tell us anything either. She says she's not aware of his status. So how does that give us his status? Well, and even if it was not sufficient, any error in not having enough there would be harmless because Mr. Walker did not set forth any evidence of his status and this court held in Ortner that failing to require proof that a defendant was not Indian was not plain error. Well, okay, I thought maybe you were about to answer the question that I asked here, the government, which is, does it matter once, if we accept, of course, we've got the other issue, but let's assume that you're correct, that there's authentication of the victim's Indian status. Does it really matter at that point what Mr. Walker's status is for purposes of jurisdiction? No, it does not. All right, but I'm wondering if you can help with some authority to that fact because the indictment charged 1152. And if it turns out he was Indian, then it didn't charge 1153. So do you have any authority that it would be harmless error? I do not, but I think that that turns his foundational argument, which is what is raised here and what he's claiming, to a sufficiency of the evidence argument. And taking all of the evidence in the light most favorable into the prosecution, any rational juror could have found that Mr. Walker was not an Indian beyond a reasonable doubt. I don't see the beyond a reasonable doubt if all you've got is the victim was not aware and Sergeant Lindsey had had some prior contact with him. That's all you've got to go on. And Sergeant Lindsey also testified that his department was smaller and that he had prior contacts with him and that he now inquires of anyone whether or not they're a member of any federally recognized tribe in all of his investigations. Did he inquire here? Or was he ever asked whether he inquired? He was not asked whether he inquired here. We're reviewing this for plain error. Is that right? Is there any objection with respect to the evidence of the defendant's Indian status? It was plain error for Ms. Derrickson's testimony. There was not any objection there, but for Sergeant Lindsey's, it was abuse of discretion. And Ms. Derrickson said the defendant's my uncle, I lived with him, and I never heard anything that he, I never heard anything saying he had Indian status. Is that right? She was asked, to your knowledge, is your uncle a member of any tribes? And her response was, not that I'm aware of. And how long had she lived with him? Do we know? I don't, I don't know how long. Had she lived with him? But she lived with him, yes. And she had lived with her grandmother, which was his mother, for a period of years before that. And he was staying there. And in the trial testimony, it showed he was, that she, when she announced she was pregnant, you know, he was there. So that could infer that he, you know, was there for as long as it was that she, you know, had knew that she was pregnant. And I do want to talk very quickly about why the CDIB card is self-authenticating under Rule 902.1. It's self-authenticating for two reasons. Under 902.1a, it holds a seal from the Department of the Interior, Bureau of Indian Affairs, and a signature purporting to be an attestation or an execution. I think what Appellant is confused about is under Rule 902.2, that requires a signature of an employee from the issuing agency for unsealed documents. Ms. Derrickson's document here was sealed. It contained the seal and it contained a signature purporting to be an attestation or execution. Therefore, it was a self-authenticating document. Do you have any explanation as to why the same name appeared on both cards? I don't know except the CDIB card, I mean, it is a certificate of degree of Indian blood certifying Ms. Derrickson's quantum of Indian blood. So it would make sense that a tribal registrar would be the person to sign that card. So it would make sense for that card, but what about the CBID card? Well, that's the CDIB card. And the CDIB card is a certification of her blood quantum. And so the tribal registrar signed that she had a particular blood quantum, which is determined through the tribal roles. And they were signed two years apart? Is that what we heard earlier? I don't recall exactly the years. I think what was in the appellant's brief was that that was issued when she was two years old. If there are no further questions from this court, we ask that you affirm Mr. Walker's conviction. I have a question. Oh, sure. Okay. I'll talk to you then. Go ahead. It's my understanding that you don't object to our construing the special condition of release as not requiring the questionable constitutional requirements. Is that correct? We absolutely agree that Mr. Walker's due process rights would be violated if the probation officer were to force him to take medication or be taken into custody for inpatient treatment. However, the way that that condition is written now, Mr. Walker may elect to take prescribed medication or to voluntarily participate in an inpatient program. You don't have a problem though with our construing that condition as not imposing a requirement that he take psychotropic medication or be confined for treatment, is that right? Absolutely not. Because under this court's holding, yes. Thank you. If there are no further questions, I would ask that you affirm Mr. Walker's conviction and sentence. Thank you. Thank you, counsel. Case is submitted and counsel are excused.